Filed 6/26/26  In re Al.W. CA3

NOT TO BE PUBLISHED

**California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.**

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

THIRD APPELLATE DISTRICT

(San Joaquin)

| | |
|---|---|
| In re Al.W., a Person Coming Under the Juvenile Court Law. | C104574 |
| SAN JOAQUIN COUNTY HUMAN SERVICES AGENCY , <br>     Plaintiff and Respondent, <br><br>     v. <br><br> A.W., <br>     Defendant and Appellant. | (Super. Ct. No. STKJDDP20220000481) |

A.W. (mother)  appeals from the juvenile court's order terminating her parental rights to two of her three children.  She contends the court and the San Joaquin County Human Services Agency (Agency) did not conduct a sufficient inquiry under the Indian Child Welfare Act (ICWA) and asks us to conditionally reverse the order terminating parental rights and remand the matter for compliance with the requirements of the ICWA. The Agency responds that its inquiry was adequate, though it does not explicitly address all of mother's arguments.  We find mother's arguments more convincing and will conditionally reverse and remand for further proceedings.

1

## FACTUAL AND PROCEDURAL BACKGROUND

In December 2022, the Agency filed a petition pursuant to Welfare and Institutions Code section 300[1] alleging that the three children came within the jurisdiction of the juvenile court because the children suffered, or there was a substantial risk that they would suffer, serious physical harm or illness because of the parents: (1) inability to adequately supervise and protect the children; (2) willful or negligent failure to provide the children with adequate food, clothing, shelter, or medical treatment; and (3) inability to provide regular care for the children due to the parents' mental illness or substance abuse.

In the first detention report, the Agency's children's services bureau reported that mother and A.J., the father of one of the three children, said they may be eligible for membership in a Cherokee tribe. J.W., the father of the other child for whom parental rights are at issue in this appeal, said he had no known Indian ancestry in his family. An Agency social worker filled out Indian child inquiry forms stating that she had reason to believe all three children may be Indian children under the ICWA. The social worker also indicated on the form that she had "contacted the tribe(s) that the child[ren] may be affiliated with and worked with them to establish whether [each] child is a member or eligible for membership in the tribe(s)" and that she had attached "[i]nformation detailing the tribes contacted, the names of the individuals contacted, and the manner of the contacts," but no such information was attached to the form.

At the detention hearing, the juvenile court asked mother and the two fathers if they had Native American or Indian ancestry. Mother responded that she had Cherokee ancestry, A.J. responded that he had native Indian and native Indian Creole ancestry, and J.W. responded that he did not. The court's minute order indicates that one or more "parent/guardian were advised of Indian Heritage requirements and given the ICWA-020

---

[1] Undesignated statutory references are to the Welfare and Institutions Code.

2

[Parental Notification of Indian Status] form," but the advisement is not in the reporter's transcript.

Two days after the detention hearing, the Agency met with mother and determined that she had one sister and three brothers, with whom she had recently lived at her mother's home. The Agency met with A.J. the same day and determined that he had no siblings, his mother lived in Stockton, and his father lived in Alabama. A.J. reported having a close relationship with his mother and at one point asked Agency staff if his mother could visit his child. In January 2023, the Agency met with J.W. and determined that he had two sisters and a brother, but he was raised by his father's sister, Victoria W., and was closer to his cousins than his siblings. J.W.'s father lived at a transitional drug treatment program in Stockton, and his mother had passed away.

In early January 2023, mother and both fathers filed Parental Notification of Indian Status forms. Mother's form indicated that her ancestor, Ted W., was a member of a Cherokee tribe, J.W.'s form indicated no Indian tribe membership in his family, and A.J.'s form indicated that his ancestor was a member of a Cherokee tribe in Louisiana.

In late January 2023, the Agency filed a Notice of Child Custody Proceeding for Indian Child form for each of the three children, which indicated that the Agency had mailed copies of the form to the Bureau of Indian Affairs, the Cherokee Nation, the Eastern Band of Cherokee Indians, the Jena Band of Choctaw Indians, the Mississippi Band of Choctaw Indians, the Chickasaw Nation, the Choctaw Nation of Oklahoma, and the United Keetoowah Band of Cherokee Indians in Oklahoma. The record does not clearly indicate what the Agency attached to each of these forms, but it appears that the Agency identified several of mother's ancestors, including two members of an unidentified Choctaw tribe; at least two members of the Chickasaw Nation; and ancestors who lived in the Chickasaw Nation, Cherokee territory in Oklahoma, and other "Indian Territory." The Agency did not document how it obtained this information in its reports and the record does not include service logs for this time period, but the documents

appear to have originated from the website Ancestry.com. The form lists mother's biological father as "Teddy Jim Willis," born July 8, 1938, in Oklahoma. This information appears to be based on a document from the website Ancestry.com that shows a "Teddy J Willis," born in approximately 1935 in Oklahoma to Lloyd and Eleanor Willis. These names do not match the names the Agency identified as mother's grandparents. The Agency also listed A.J.'s mother on the form for his child with a different first and middle name and a different address than he had provided in their meeting.

The Agency listed mother on the Notice of Child Custody Proceeding for Indian Child forms and checked the box indicating it had mailed the notice to her, but the Agency listed her as homeless without an address.[2] The form lists the San Joaquin County Public Defender as a "party" notified, without indicating that the public defender was not a party but served as mother's attorney.

Each of the contacted tribes — the Cherokee Nation, the Eastern Band of Cherokee Indians, the Jena Band of Choctaw Indians, the Mississippi Band of Choctaw Indians, the Chickasaw Nation, the Choctaw Nation of Oklahoma, and the United Keetoowah Band of Cherokee Indians in Oklahoma — responded between February and March 2023 stating that the children were not eligible for membership in the tribe.

A.J. was killed in March 2023, which the Agency was aware of by August 2023 at the latest.

Mother's brother, Robert, who lived in Oregon, participated in a child and family team meeting in July 2023. At that meeting, mother and Robert told Agency staff that mother had Cherokee, Choctaw, and Blackfeet heritage and that the Cherokee heritage was on mother's maternal side while the Blackfeet heritage was on her paternal side. The

---

[2] The Agency concedes it did not mail the form to mother, despite the indication on the form, because she "was homeless at the time and did not have a mailing address."

4

Agency later mailed Robert a Parental Notification of Indian Status form. J.W.'s sister, L.G., also attended the July 2023 meeting, though the Agency did not document any conversations about Indian heritage at the time. Robert and L.G. also participated in a December 2023 child and family team meeting, but the Agency apparently did not discuss Indian heritage at that meeting.

In January 2024, the Agency attempted to use a "Lexis Nexis search" to find family members of the fathers, whom the fathers had identified in meetings in December 2022 and January 2023, but the search produced no results. Later that month, the Agency used a "Family Finding referral" to find maternal family members, which identified contact information for mother's father and mother. The Agency attempted to contact mother's parents (though mother had already told the Agency that her mother had died) and received no response. In June 2024, the Agency reattempted the LexisNexis search for the fathers with the same lack of results.

In August 2024, J.G. filed a Parental Notification of Indian Status form indicating that she and the children are or may be members or eligible for membership in the Chickasaw tribe in Oklahoma. J.G. also indicated that her ancestor, Ted W. was a member of the Chickasaw tribe in Oklahoma. In August 2024, mother filed a second Parental Notification of Indian Status form indicating that she may be a member of or eligible for membership in the Chickasaw tribe of Oklahoma.

In September 2024, Robert, L.G., J.G., and J.G.'s husband participated in a child and family team meeting. J.G. stated that her father, Ted W., had been a member of the Chickasaw tribe. V.W., whom J.W. described as his aunt who raised him but whom the Agency misidentified as the children's paternal grandmother, and B.C., J.W.'s stepmother, also participated. Nothing indicates that the Agency asked V.W., L.G., or B.C. about Indian heritage in their families.

In October 2024, J.G. appeared at a hearing, and the juvenile court asked her if she had Native American heritage in her family and if she had spoken with the social worker. J.G. responded "yes" to both questions.

In December 2024, the Agency reattempted the LexisNexis search for the fathers with the same lack of results. An Agency staff member identified a family member of J.W. in the Agency's own system, but the notes do not indicate the identity of the family member or the relationship with J.W. or that any action was taken with this information. The Agency also conducted another LexisNexis search for maternal relatives, which returned results including the same "Teddy Jim Willis" whose Ancestry.com records indicated that his parents were not mother's grandparents. The Agency apparently mailed notices of some sort to the fifteen individuals identified in this search. Four of the notices were returned undelivered, and the only response the Agency received indicated that the responding individual was not related to mother. The Agency also held a child and family team meeting in December at which a staff member asked L.G. if she had any Native American ancestry. L.G. stated that she did not. In late December 2024, an Agency social worker called J.G. and left a voice mail asking her to call back. The social worker then sent J.G. a text message asking for her address so that the Agency could send her a Parental Notification of Indian Status form.

In January 2025, an Agency staff member suggested that a search would be conducted for A.J.'s relatives as he had died and mother did not have any information about his relatives. The staff member also noted that Robert did not feel comfortable filling out the Parental Notification of Indian Status form without having more information about his relatives.

In March 2025, an Agency staff member noted that the Agency had no contact information for mother's father, Ted W., despite the earlier searches and the information provided to the Indian tribes. The Agency's March 2025 ICWA compliance report does not mention that mother and Robert stated that mother had Blackfeet heritage, despite the

6

Agency's previous notes mentioning this information four times. The ICWA section of the Agency's August 2025 disposition report mentioned mother's asserted Blackfeet heritage but did not report any effort to contact the Blackfeet Tribe of the Blackfeet Indian Reservation of Montana (Blackfeet Tribe).

At the disposition hearing in August 2025, the juvenile court found "that due diligence has been exercised in an effort to determine whether the minors are Indian children," that "the minors are not Indian children," and that "ICWA does not apply to them." The court then found the two children were likely to be adopted and terminated mother's parental rights.

## DISCUSSION

Mother contends the inquiry and notice requirements of the ICWA were not met for three reasons: (1) the Agency never contacted the Blackfeet Tribe to inquire about the children's eligibility for membership; (2) the Agency failed to provide mother with a copy of the Notice of Child Custody Proceeding for Indian Child form sent to the other seven Indian tribes; and (3) the Agency failed to inquire of known and readily available relatives about the children's Indian heritage. As to the first point, the Agency seems to imply[3] that it was mother's half-brother, not mother, who had Blackfeet ancestry. Second, the Agency suggests it mailed the notice to mother's attorney because she had no address. Finally, the Agency suggests it contacted enough relatives, without responding to all of mother's points. We are persuaded by mother's contentions and unconvinced by the Agency's arguments.

---

[3] It is difficult to parse the Agency's response, especially because the Agency declined to use subheadings to respond to mother's three clear subheadings, despite the requirements of the Rules of Court. (See Cal. Rules of Court, rule 8.204(a)(1)(B).)

Undesignated rule references are to the California Rules of Court.

*I.*

The "ICWA establishes minimum standards for state courts to follow before removing Indian children from their families and placing them in foster care or adoptive homes." (*In re Dezi C.* (2024) 16 Cal.5th 1112, 1129 (*Dezi C.*); 25 U.S.C. § 1921; 25 C.F.R. § 23.106 (2024).) "The issue of whether ICWA applies in dependency proceedings turns on whether the minor is an Indian child. An 'Indian child' is defined as 'any unmarried person who is under age eighteen and is either (a) a member of an Indian tribe or (b) is eligible for membership in an Indian tribe and is the biological child of a member of an Indian tribe.' (25 U.S.C. § 1903(4).) At the commencement of a child custody proceeding, the court is obligated to inquire from each participant whether there is a 'reason to know' that the child is or may be an Indian child. (25 U.S.C. § 1912(a); 25 C.F.R. § 23.107(a) (2024).)" (*Dezi C.*, at pp. 1129-1130, fn. omitted.)

Under California's implementing provisions, "[a]gencies and juvenile courts have 'an affirmative and continuing duty' in every dependency proceeding to determine whether ICWA applies by inquiring whether a child is or may be an Indian child. (§ 224.2, subd. (a).)" (*Dezi C.*, *supra*, 16 Cal.5th at pp. 1131-1132.) "When the agency has 'reason to believe' that an Indian child is involved, further inquiry regarding the possible Indian status of the child is required. (§ 224.2, subd. (e); see also rule 5.481(a)(4).) The required further inquiry includes (1) interviewing the parents and extended family members; (2) contacting the Bureau of Indian Affairs (BIA) and State Department of Social Services; and (3) contacting tribes the child may be affiliated with and anyone else that might have information regarding the child's membership or eligibility in a tribe. (§ 224.2, subd. (e)(2)(A)-(C).) At this stage, contact with a tribe 'shall, at a minimum, include telephone, facsimile, or electronic mail contact to each tribe's designated agent for receipt of [ICWA] notices,' and 'sharing information identified by the tribe as necessary for the tribe to make a membership or eligibility determination, as well as information on the current status of the child and the case.' (*Id.*,

8

subd. (e)(2)(C).)" (*Dezi C.*, at pp. 1132-1133, fn. omitted.) "If the inquiry establishes a reason to know an Indian child is involved, notice must be provided to the pertinent tribes. (§ 224.3, subds. (a), (b); 25 U.S.C. § 1912(a).)" (*Dezi C.*, at p. 1133.)

"The juvenile court's factual finding that ICWA does not apply is 'subject to reversal based on sufficiency of the evidence.' (§ 224.2, subd. (i)(2).)" (*Dezi C.*, *supra*, 16 Cal.5th at p. 1134.)[4] The substantial evidence test " 'requires us to determine if reasonable, credible evidence of solid value supports the court's' ICWA finding." (*In re Kenneth D., supra*, 16 Cal.5th at p. 1101.) Our Supreme Court has also noted that, " '[o]n a well-developed record, the court has relatively broad discretion to determine whether the agency's inquiry was proper, adequate, and duly diligent on the specific facts of the case. However, the less developed the record, the more limited that discretion necessarily becomes.' " (*Id.* at pp. 1101-1102.)

## II.

Mother first contends that the Agency did not comply with its duty to make further inquiry regarding the children's eligibility for membership in the Blackfeet Tribe. As noted above, the court and the Agency had a duty of further inquiry upon learning that the children had Blackfeet heritage. (§ 224.2, subd. (e).) This duty requires "contacting

---

[4] As our Supreme Court has noted, some appellate courts have "used a hybrid standard, reviewing for substantial evidence whether there is reason to know a minor is an Indian child, and reviewing a finding of due diligence and proper inquiry for abuse of discretion." (*In re Kenneth D.* (2024) 16 Cal.5th 1087, 1101; see *Dezi C., supra*, 16 Cal.5th at p. 1141 ["the juvenile court's fact-specific determination that an inquiry is adequate, proper, and duly diligent is 'a quintessentially discretionary function' "].) Here, mother has argued only that the juvenile court's finding is not supported by substantial evidence, so we need not determine whether an abuse of discretion standard applies or whether the court abused its discretion. In any event, where " 'the appellate court will be evaluating the *factual basis* for an exercise of discretion, there likely will be no practical difference in application of the two standards.' " (*In re Caden C.* (2021) 11 Cal.5th 614, 641.)

tribes the child may be affiliated with and anyone else that might have information regarding the child's membership or eligibility in a tribe. (§ 224.2, subd. (e)(2)(A)-(C).)" (*Dezi C.*, *supra*, 16 Cal.5th at pp. 1132-1133.) The record lacks any evidence that the Agency carried out this duty.

The Agency contends: "Based on Robert's statement, which made a clear distinction between [mother]'s and Robert's relationship with the [mother's father], it would appear that Robert and [mother] did not share the same father." The Agency does not quite make the argument explicit, but we understand its point to be that the Blackfeet heritage was Robert's and not mother's. This is an unreasonable interpretation of the record. The Agency's own entry from the report it prepared for the disposition hearing says this: "On July 31, 2023, during a CFTM video conference, the mother indicated she has Native American [a]ncestry, specifically, Cherokee and Blackfoot. The maternal uncle, Robert [], indicated that on their maternal family side they are Cherokee and on [mother]'s paternal family side they are Blackfoot." This passage is essentially identical to the other five notes the Agency made about the July 31, 2023, meeting and unambiguously refers to mother's heritage, not Robert's. These notes provide no evidentiary support for the inference the Agency is suggesting. The Agency offers no other explanation for its failure to contact the Blackfeet Tribe, even though mother has explicitly put that failure at issue, and the record lacks any evidence of a reason.

*III.*

Mother next contends that the Agency's inquiry was inadequate because it should have provided her copies of the Notice of Child Custody Proceeding for Indian Child forms sent to seven Indian tribes for her three children. Mother cites section 224.3, subdivision (a)(3), but section 224.3 applies only when the court or the Agency has "reason to know" that an Indian child is involved. (§ 224.3, subd. (a).) Here there was not "reason to know" that the children were Indian children. (See § 224.2, subd. (d).) Mother also claims that she lost the opportunity to "assess the information the Agency

10

had about [her family] and possibly offer additional relative statistical data that was clearly missing from the [form]." Although the Agency may have filled out the forms incorrectly by (1) indicating it mailed copies to mother even though she lacked a mailing address and (2) including her attorneys as a "part[y] notified," this information is nevertheless substantial evidence that the Agency did provide copies of the forms to mother's attorneys. This gave her the ability to analyze the information provided to the tribes. Accordingly, we reject this basis for finding the Agency's inquiry inadequate.

*IV.*

Finally, mother contends that the Agency failed to inquire of known and readily available relatives about the children's Indian heritage. Specifically, mother argues that the Agency should have attempted to contact: (1) mother's other two brothers, especially given that Robert and J.G. both provided information about the family's Indian heritage that turned out to be well-founded; (2) J.W.'s relatives; and (3) A.J.'s relatives. The Agency responds to only some of mother's contentions. We conclude the Agency's documentation is insufficient to serve as substantial evidence that it performed an adequate inquiry.

As noted above, when the Agency has reason to believe that an Indian child is involved in proceedings, it must, among other things, "interview … the parents and extended family members" and contact anyone else that might have information regarding the child's membership or eligibility in a tribe. (§ 224.2, subd. (e)(2)(A), (C).) The Agency also "must on an ongoing basis include in its filings a detailed description of all inquiries, and further inquiries it has undertaken, and all information received pertaining to the child's Indian status, as well as evidence of how and when this information was provided to the relevant tribes. Whenever new information is received, that information must be expeditiously provided to the tribes." (Rule 5.481(a)(5).) "Extended family member" in this context means "a person who has reached 18 years of age and who is the Indian child's grandparent, aunt or uncle, brother or sister, brother-in-

11

law or sister-in-law, niece or nephew, first or second cousin, or stepparent." (§ 224.1, subd. (c)(1).) Our Supreme Court has interpreted this duty of inquiry to apply, not to every extended family member, but rather to "people who are reasonably available to help the agency with its investigation into whether the child has any potential Indian ancestry." (*Dezi C.*, *supra*, 16 Cal.5th at p. 1140.)

First, with respect to mother's family, the record lacks any evidence that the Agency tried to contact mother's other two siblings, even though the Agency learned the siblings' names at the outset of the case and two of those siblings participated in regular meetings with Agency staff. This means that the Agency either did not take sufficient affirmative steps to inquire of reasonably available relatives or did not document its efforts to do so. Additional information from mother's family would have been especially helpful in this situation because mother and her siblings stated that mother's father, Ted. W., had been a member of an Indian tribe and the person the Agency identified as mother's father (and told the seven notified tribes about) appears not to match the other information the Agency provided to the tribes. In sum, there is no substantial evidence that the Agency adequately inquired of mother's siblings about the family's Indian heritage.

Second, with respect to J.W.'s relatives, we conclude substantial evidence supports the adequacy of the Agency's inquiry. J.W. and his sister, L.G., consistently stated that they had no Indian heritage. V.W. is J.W.'s child's great-aunt and B.C. is the child's stepgrandmother, so they are not "extended family members" under the statute. Accordingly, the Agency had no reason to consider V.W. or B.C. as "people who are reasonably available to help the agency with its investigation into whether the child has any potential Indian ancestry" (*Dezi C.*, *supra*, 16 Cal.5th at p. 1140), or as people who might have information regarding the child's membership or eligibility in a tribe (§ 224.2, subd. (e)(2)(C)).

Finally, with respect to A.J.'s family, A.J. told the Agency in December 2022 at the outset of these proceedings that his mother lived in Stockton and his father lived in Alabama, though A.J. had not spoken with him in more than six months. A.J. also told the court that he had Cherokee ancestry and asked the Agency if his mother could visit with his child, but the Agency did not document any attempts to obtain contact information for A.J.'s family by the time he was killed in March 2023. After A.J.'s death, the Agency's only efforts to locate A.J.'s family were asking mother and attempting repeated LexisNexis searches, which turned up no results. The Agency did not document why it was unable to locate anyone locally who knew A.J.'s mother, especially in the aftermath of his killing, when law enforcement would likely have tried to locate his next of kin. Without documented reasons for relying on LexisNexis searches to find someone whose name they knew and who lived locally, we cannot say the Agency's inquiry into A.J.'s family was diligent.

In sum, substantial evidence does not support the juvenile court's determination that the Agency adequately inquired of reasonably available family members, or adequately documented their efforts, about the children's Indian heritage.

*V.*

Because substantial evidence does not support the juvenile court's determination that the Agency conducted a diligent inquiry of (1) the children's Blackfeet heritage, (2) mother's readily available relatives, and (3) A.J.'s readily available relatives, the juvenile court erred by finding the Agency conducted a diligent inquiry.

When a child welfare agency's "Cal-ICWA inquiry is inadequate, it is impossible to ascertain whether the agency's error is prejudicial" because " '[u]ntil an agency conducts a proper initial inquiry and makes that information known, it is impossible to know what the inquiry might reveal.' " (*Dezi C.*, *supra*, 16 Cal.5th at p. 1136.) We also cannot say whether the contacted tribes would respond differently to the Agency's inquiries if additional information about the children's family were to be included.

13

Failure to conduct an adequate ICWA inquiry therefore "requires conditional reversal with directions for the child welfare agency to comply with the inquiry requirement of section 224.2, document its inquiry in compliance with rule 5.481(a)(5), and when necessary, comply with the notice provision of section 224.3." (*Dezi C.*, at p. 1136.)

## DISPOSITION

The order terminating parental rights is conditionally reversed and the matter is remanded for the limited purpose of complying with the inquiry and notice provisions of the ICWA and California's implementing provisions. If the juvenile court thereafter finds a proper and adequate further inquiry and due diligence has been conducted and concludes the ICWA does not apply, the order shall be reinstated. If, however, the juvenile court concludes the ICWA applies, the juvenile court is ordered to conduct a new section 366.26 hearing and proceed in accordance with the ICWA and California implementing provisions.

/s/
MESIWALA, J.

We concur:

/s/
HULL, Acting P. J.

/s/
KRAUSE, J.

14